Justice Laurie McKinnon delivered the Opinion of the Court.
***415 ¶ 1 A jury convicted David Lynn Weik of stalking Thresa Goldberg. The Fourth Judicial District Court, Missoula County, sentenced Weik to five years commitment in the Montana State Prison with two years suspended and $42,798.80 in restitution. Weik appeals, raising two issues:
1. Did Weik's trial violate his right to confrontation because he could not see Goldberg during her testimony?
***416 2. Was the restitution amount written in the District Court's judgment incorrect?
We affirm but instruct the District Court to correct its written judgment regarding the restitution amount.
FACTUAL AND PROCEDURAL BACKGROUND
¶ 2 Goldberg and Weik met in 1982, when Goldberg was approximately sixteen years old and Weik was approximately twenty *54 years old. Goldberg and Weik had what Goldberg described as a short, teenage romance. In the following decades, Goldberg and Weik kept in intermittent contact. In 2011, Weik and Goldberg, then a divorced mother of three adult children, reconnected and developed a romantic relationship again. Goldberg ended the romantic aspect of their relationship, but the two remained friendly and talked about moving to Montana and starting a horse therapy business together.
¶ 3 In 2012, Goldberg moved to Montana, began working, and met Frank Broad, whom she began dating. Weik also moved to Montana, and Weik and Goldberg leased a house together beginning in October 2012. In December 2013, Goldberg moved out of the house she shared with Weik and into Broad's house. Goldberg moved because Weik was moody, he still seemed to be interested in having a romantic relationship with her, and she noticed he was removing her personal belongings, including hair from her hairbrush. Goldberg also noticed her passport was missing when she moved out.
¶ 4 After moving, Goldberg attempted to cut off contact with Weik, but she felt as though Weik was watching and following her. Goldberg frequently saw Weik while she drove, at the grocery store, and at the post office. Goldberg petitioned the justice court for a temporary order of protection against Weik. In April 2014, the justice court issued a temporary order of protection prohibiting Weik from entering within 1500 feet of Goldberg, Goldberg and Broad's house, and Goldberg's sister's house. The order also prohibited Weik from communicating with Goldberg. The justice court later extended the length of the protective order, and the protective order eventually became permanent. Despite the protective order, Goldberg was uncomfortable when alone and fearful in public settings.
¶ 5 While the protective order was in place, Weik entered a restaurant where Goldberg and Broad were seated at a bar and sat down in a barstool directly next to Goldberg. Weik apparently noticed Goldberg and moved to a seat across the restaurant from Goldberg but continued to stare at her. Goldberg contacted the police and Weik was later convicted for misdemeanor violation of a protective order. As part of his ***417 sentence, Weik served probation and wore a GPS monitoring device.
¶ 6 In further violation of the protective order, Weik: (1) sent Goldberg a letter; (2) called her; (3) entered within 1500 feet of Goldberg at a grocery store; (4) entered within 1500 feet of Goldberg at a different store; (5) entered within 1500 feet of Goldberg's sister's house; and (6) entered within 1500 feet of Goldberg while she retrieved mail from her post office box at the post office. At the time, Goldberg held post office box number 16291. According to a post office employee, Weik inquired about renting post office box 16191, the box directly adjacent to Goldberg's. Box 16191 was unavailable, but Weik continued asking about its availability and eventually rented it. The letter Weik sent Goldberg was a copy of a civil lawsuit he filed against Goldberg, Goldberg's sister, and Broad in federal court. Goldberg hired an attorney and the federal court dismissed Weik's civil suit. Next, Weik filed a similar civil lawsuit against Goldberg, Goldberg's sister, and Broad in state district court. Goldberg hired a different attorney and the district court dismissed Weik's second civil suit.
¶ 7 As a result of Weik's protective order violations, the State charged Weik with felony stalking and the case proceeded to a jury trial in February 2016. At trial, Goldberg testified at length about her relationship with Weik during the approximately thirty-three years since they met. Before trial and at the beginning of trial, Weik complained he was unable to see Goldberg during her testimony because of the location of his seat at the defense table and the size and shape of the courtroom. The District Court suggested rearranging the furniture in the "cramped" courtroom to enhance Weik's sightline but was unable to satisfy Weik with an arrangement. The District Court attempted to change courtrooms but was unable to do so. Weik asked to sit at the table the State typically occupies because it is directly opposite the witness stand, but the State argued it needed that table because it contained a specific portal for accessing the computer network. Further, the State argued it would *55 be detrimental to Goldberg to be very close to Weik while she testified. During a discussion between the parties and the District Court about the courtroom's configuration, the Bailiff interjected and explained the defense table in that courtroom is considered the safest place for defendants and the most convenient for security personnel. Alternatively, Weik asked if he could leave his seat during Goldberg's testimony and move around the courtroom to get a better view of her. The District Court refused to allow Weik to exchange tables with the State or move around the room.
¶ 8 At trial, the State presented evidence from a probationary search ***418 of Weik's storage unit. Weik's probation officer found photocopies of several of Goldberg's personal documents, including her passport, social security card, birth certificate, credit report, and an airplane ticket with her name on it. Weik's probation officer also found two bags of Goldberg's hair. Goldberg assisted in a subsequent search of Weik's storage unit and shed and recovered a large amount of her personal property, including: her purse, flowerpot, books, horse blankets, coffee cups, and clothing; her granddaughter's socks, clothing, tricycle, and stuffed animal; discarded packaging from her facial lotions; discarded wrapping paper and a wine bottle from her family's Christmas celebration in 2013; and her son's belt buckle. Additionally, Goldberg recovered photographs of herself and her vehicle and printed-out images of her professional website and social media page.
¶ 9 The State also presented evidence that, because of her fear of Weik, Goldberg purchased a home security system, slept with a gun, placed mace in her car and purse, placed bear spray at each of her home's doors, and sought therapy. Goldberg began taking medications for anxiety, depression, and insomnia. Additionally, Goldberg suffered headaches, heightened blood pressure, nightmares, stress, and stress-induced shingles, which necessitated hospitalization and a prolonged absence from work. Broad testified and described Goldberg's personality and lifestyle changing during this time-Goldberg became reclusive, distraught, nervous, and frightened. Broad described trying to surprise Goldberg by coming home early. Instead of the happy surprise he intended, Broad inadvertently scared Goldberg by entering the house unannounced. Goldberg met Broad in the hallway with a gun pointed at him. Goldberg vomited after realizing the intruder she imagined was actually her boyfriend, Broad. Goldberg's sister testified and agreed with Broad's description of Goldberg's personality and lifestyle changes, stating, "I think she's progressively gotten worse over time."
¶ 10 The jury found Weik guilty of stalking Goldberg and the District Court held a sentencing hearing. At the hearing, Goldberg submitted exhibits and testified in support of her amended restitution request, providing details about the expenses she incurred. Goldberg claimed that, because of Weik, she incurred legal expenses defending against the two civil lawsuits he filed against her, medical expenses, lost wages and health insurance expenses during her prolonged absence from work, the expense of replacing her passport, and lost wages due to trial preparation and participation. After the hearing and post-hearing briefing, the District Court ordered Weik to pay $42,264.06 in restitution. This figure reflected Goldberg's amended restitution ***419 request, less an amount Goldberg claimed for lost wages due to trial preparation and participation ($516.92), which the District Court determined was not compensable as restitution. Later, the District Court entered a final, written judgment sentencing Weik to five years commitment in the Montana State Prison with two years suspended and restitution totaling $42,798.80, the amount Goldberg initially requested prior to amending her request. Weik appeals.
STANDARDS OF REVIEW
¶ 11 We review constitutional questions, including questions concerning the right to confrontation, de novo. State v. Stock , 2011 MT 131, ¶ 16, 361 Mont. 1, 256 P.3d 899 (citing State v. Norquay , 2011 MT 34, ¶ 13, 359 Mont. 257, 248 P.3d 817 ). What constitutes an appropriate measure of restitution is a question of law that we review to determine whether the district court's interpretation of the law is correct.
*56 State v. Passwater , 2015 MT 159, ¶ 9, 379 Mont. 372, 350 P.3d 382 (citing State v. Aragon , 2014 MT 89, ¶ 9, 374 Mont. 391, 321 P.3d 841 ). In relation to a restitution award, we review a court's factual findings for clear error. Passwater , ¶ 9 (quoting Aragon , ¶ 9 ). A finding is clearly erroneous if it is not supported by substantial evidence, if the court misapprehended the effect of the evidence, or if our review of the record convinces us that the court made a mistake. Passwater , ¶ 9 (quoting Aragon , ¶ 9 ). Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion; it is "more than a mere scintilla of evidence, but may be somewhat less than a preponderance." Passwater , ¶ 9 (quoting Aragon , ¶ 9 ).
DISCUSSION
¶ 12 1. Did Weik's trial violate his right to confrontation because he could not see Goldberg during her testimony?
¶ 13 Our case law distinguishes Article II, Section 24, of the Montana Constitution from the Sixth Amendment of the United States Constitution, which both afford a criminal defendant the right to confront witnesses against him. See Stock , ¶ 28. The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. The "primary purpose" of the Confrontation Clause "is to 'ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding' through a combination of elements of confrontation."
***420 Stock , ¶ 23 (quoting Maryland v. Craig , 497 U.S. 836, 845, 110 S.Ct. 3157, 3163, 111 L.Ed.2d 666 (1990) ). The elements of confrontation include: (1) physical presence of the witness; (2) testimony under oath; (3) cross-examination of the witness; and (4) observation of the witness's demeanor by the trier of fact. Stock , ¶ 23 (citing Craig , 497 U.S. at 845-46, 110 S.Ct. at 3163 ). The right to confrontation is a fundamental right, but the right is not recognized as an " 'absolute right to a face-to-face meeting with witnesses against them at trial.' " Stock , ¶ 23 (quoting Craig , 497 U.S. at 844, 110 S.Ct. at 3162-63 ). For example, "the [Confrontation] Clause permits, where necessary, the admission of certain hearsay statements against a defendant despite the defendant's inability to confront the declarant at trial." Craig , 497 U.S. at 847-48, 110 S.Ct. at 3164.
¶ 14 Consistent with the United States Constitution, Montana's Confrontation Clause provides that "[i]n all criminal prosecutions the accused shall have the right ... to meet the witnesses against him face to face." Mont. Const. art. II, § 24. Primarily, Montana's Confrontation Clause guarantees criminal defendants the right to cross-examine witnesses. Stock , ¶ 29. Cross-examination "produces truth" because it allows the trier of fact to judge the witness's credibility by evaluating his or her demeanor, body language, and level of hesitance in relation to his or her testimony. Stock , ¶ 29. Although we recognize Montana's Confrontation Clause affords broader protections than its federal counterpart and includes the express term "face to face," we have also held that it does not always require literal face-to-face confrontation between a defendant and witness. Stock , ¶ 28.
¶ 15 Instead of requiring literal face-to-face confrontation, in City of Missoula v. Duane , 2015 MT 232, ¶ 25, 380 Mont. 290, 355 P.3d 729, while recognizing a preference for "personal presence of the witness in the courtroom," we held that testimony facilitated by the program Skype, a two-way audio and video technology, satisfied the hallmarks of confrontation. There, the record indicated the court easily made the Skype connection, the witness took an oath, the witness could hear and see the court and the jury could hear and see her, and counsel examined and cross-examined the witness without complication or technical difficulty. Duane , ¶ 19. Again, in State v. Davis , 253 Mont. 50, 58, 830 P.2d 1309, 1315 (1992), we held utilizing an opaque screen as a sightline barrier between child abuse victims and the defendant did not violate the defendant's Sixth Amendment confrontation right because the witnesses were physically present in the courtroom; the witnesses took an oath; the defendant's counsel cross-examined *57 the ***421 witnesses; and the jury could see the witnesses' demeanors. Further, although a screen blocked the defendant's view, the judge, the State's counsel, and the defendant's counsel could all see the witnesses. Davis , 253 Mont. at 54, 830 P.2d at 1312.
¶ 16 Weik argues his "confrontation rights entitle[d] him to 'literal' face-to-face confrontation" with Goldberg during her testimony. Further, Weik argues "prohibiting him from seeing Ms. Goldberg during her testimony undermined the reliability of her testimony." Weik does not argue or mention whether he was unable to see the seven other witnesses besides Goldberg who testified during his trial. The State responds by arguing that it took no affirmative action to inhibit or proscribe Weik's view of Goldberg; it did not request to reposition the witness stand, erect a privacy screen, or ask to present Goldberg's testimony by Skype. Instead, the State argues Weik's trial met the elements of confrontation because Goldberg was physically present in the courtroom, took an oath, Weik's counsel cross-examined her, and the jury could see her. Further, the state notes that Goldberg could presumably see Weik because she identified Weik for the jury during her testimony. The State reasons that if Goldberg could see and identify Weik while testifying, Weik could see her in return.
¶ 17 Prior to trial, the parties discussed the courtroom's configuration. The District Court informed the parties that other courtrooms were unavailable due to other proceedings. Referring to the defense table, the court stated, "I think Mr. Weik could be put as far to the end of that table as possible, you know, during the testimony of the victim. So I believe that he will be able to see the victim from that angle." Thereafter the parties selected a jury and Goldberg took the witness stand.
¶ 18 As soon as Goldberg took the witness stand, the parties discussed the courtroom's configuration again outside the presence of the jury. Weik's counsel, Christopher Daly, explained that Weik and his co-counsel, Susan Boyer, could not see Goldberg "at all" from their positions seated at the defense table. The District Court granted Boyer "the opportunity to move around the courtroom," but would not allow Weik to do the same, noting Weik would have to remain seated because he was "an incarcerated Defendant." The District Court suggested bringing in an additional lectern to better accommodate Boyer. Goldberg resumed testifying and, after the District Court excused the jury at the end of the first day, the parties discussed the courtroom's configuration for a third time:
THE COURT: I realize that the arrangements were not what defense counsel wanted. But, I mean, you can, obviously, try to get ***422 some kind of furniture that you think would work better in the corner. You know what we've got to work with. So you've got a little bit of time to do that between now and Tuesday morning, if you want. As long as it fits there, I don't care.
MS. BOYER: It's not so much the furniture. It's having to peek around Suzy to even see the witness.
MS. [SUZY] BOYLAN: I thought there was a clearer view. I can certainly move over a little bit.
THE COURT: If you want-I mean, certainly Ms. Boylan could move the lectern to right in front of your chair because you're not in the chair.
After this interaction, Goldberg testified on two additional days of Weik's trial, and the record does not indicate whether the parties made any changes to the courtroom's configuration. Weik did not raise any further concern about not being able see Goldberg during the second or third day of trial.
¶ 19 Instead, the record indicates that, during the second and third day of trial, three witnesses, including Goldberg, identified Weik from the witness stand by indicating to the jury where he was sitting. The State's counsel, Boylan, asked Goldberg:
Q. So, Thresa, is the person who committed the acts of stalking you've described in the courtroom today?
[Witness Goldberg] A. Yes.
Q. And would you tell the jury where he's sitting.
A. Over there, with the gray suit and blue shirt.
THE COURT: The record will reflect she's identified the defendant.
*58 The State's counsel, Christopher Betchie, asked Matt Kazinsky, a City of Missoula police officer:
Q. And have you had any interactions with the defendant?
[Witness Kazinsky] A. I have.
Q. And-
THE COURT: The record will reflect he's identified the defendant. You may continue.
Finally, Betchie asked Sally Korn, a post office employee:
Q. Okay. And have you met the defendant David Weik?
[Witness Korn] A. Yes, I have.
Q. Okay. And do you recognize him in the courtroom today?
A. Yes, I do.
THE COURT: The record will reflect her identification of the defendant.
We conclude Weik could see Goldberg while she testified during the ***423 second and third day of his trial because multiple witnesses on the witness stand, including Goldberg, could see Weik and pointed him out to the jury. Goldberg was also able to describe what he was wearing. Further, Weik did not complain during the second or third day of trial that he was unable to see Goldberg while she testified.
¶ 20 Even though it is apparent Weik could see Goldberg during the majority of her testimony, it is also apparent that he wanted a better, closer, and more direct view. The District Court patiently and diligently attempted to adjust and accommodate Weik's requests for a better view. It offered to rearrange the furniture and allowed Weik's counsel to move around the courtroom. It also allowed Weik to sit in whatever seat at the defense table he felt had the best view and to move his seat as far to one end of the table as possible. The District Court attempted to change courtrooms, but no other courtroom was available. The District Court considered Weik's request to exchange tables with the State, but, after the State argued it could only access its computer network from the State's table and the Bailiff suggested the defense table was safest and most convenient, declined to do so.
¶ 21 Consistent with the elements of confrontation: (1) Goldberg was physically present in the courtroom; (2) Goldberg took an oath to testify truthfully; (3) Weik's counsel cross-examined Goldberg; and (4) the jury observed Goldberg throughout her testimony. See Stock , ¶ 23 (citing Craig , 497 U.S. at 845-46, 110 S.Ct. at 3163 ). The jury's observation enabled it to judge Goldberg's credibility by evaluating her demeanor, body language, and level of hesitance in relation to her testimony. Weik's trial satisfied the elements of confrontation. See Stock , ¶ 29. Even under Montana's heightened "face to face" guarantee, the elements do not afford Weik the right to be directly across from his alleged stalking victim during every minute of her testimony. Weik also argues his inability to see Goldberg undermined her credibility. However, we have long recognized the "credibility of the witnesses" is "exclusively within the province of the trier of fact." State v. Bower , 254 Mont. 1, 8, 833 P.2d 1106, 1111 (1992). Here, the jury, not Weik, was tasked with assessing Goldberg's credibility and, after doing so, found Weik guilty of stalking her. Weik's trial satisfied the elements of confrontation and did not violate his Sixth Amendment or Article II, Section 24, rights.
¶ 22 2. Was the restitution amount written in the District Court's judgment incorrect?
¶ 23 As part of a criminal sentence, a court must require an offender to make full restitution to any victim who sustained pecuniary loss because of the offense. Section 46-18-241(1), MCA. Restitution engrafts ***424 a civil remedy onto a criminal statute and creates a procedural shortcut for crime victims entitled to a civil recovery against the offender. Aragon , ¶ 16. Restitution is not limited " 'to victims defined in terms of the offense for which the defendant was convicted or to losses arising directly from the defendant's criminal conduct.' " State v. Jent , 2013 MT 93, ¶ 12, 369 Mont. 468, 299 P.3d 332 (quoting State v. LaTray , 2000 MT 262, ¶ 12, 302 Mont. 11, 11 P.3d 116 ). A "causal relation between the offender's criminal conduct and the pecuniary loss is the touchstone for determining whether a person or entity is a victim entitled to restitution." Jent , ¶ 13. *59 ¶ 24 On August 9, 2016, the District Court ordered Weik to pay $42,262.06 in restitution. This amount reflected the amended figure Goldberg requested less $516.92, an amount the court determined was not compensable as restitution. On September 26, 2016, the District Court issued its written judgment requiring Weik to pay $47,798.90 in restitution. The State concedes the District Court's September 26, 2016 Judgment is incorrect and should be corrected to match the amount included in the August 9, 2016 Restitution Order. Therefore, we instruct the District Court to correct its written judgment to accurately reflect its restitution award of $42,262.06.
¶ 25 Additionally, Weik argues the District Court clearly erred by including amounts for Goldberg's passport replacement, legal expenses, and lost wages in its restitution order. Goldberg submitted an affidavit of her pecuniary loss to the District Court and included $225 for replacing her passport; $25,080.22 for legal expenses she incurred defending against the two civil lawsuits Weik filed against her; and $11,405.28 for lost wages. Weik argues there was insufficient evidence for the District Court to find Weik took Goldberg's passport. A finding of fact is clearly erroneous if it is not supported by substantial evidence. Passwater , ¶ 9 (quoting Aragon , ¶ 9 ). The State presented evidence Weik took Goldberg's personal items, including hair from her hairbrush, while they lived together; Goldberg noticed her passport was missing when she moved out of the house she shared with Weik; and Weik had a large amount of Goldberg's personal property in his storage unit and shed, including a photocopy of Goldberg's passport. We conclude the State presented substantial evidence that a reasonable mind could conclude Weik took Goldberg's passport. See Passwater , ¶ 9 (quoting Aragon , ¶ 9 ).
¶ 26 For the first time on appeal, Weik argues Goldberg's legal expenses were not causally connected to his criminal conduct and that the amount Goldberg claimed for lost wages in her affidavit of pecuniary loss was inaccurate because of a mathematical error. At the ***425 District Court, Weik only argued there was insufficient evidence Goldberg actually paid her legal expenses and that there was no causal connection between his conduct and Goldberg's lost wages. "It is perhaps our most fundamental rule of appellate review that, with rare exception, we will not review an issue or claim that was not property preserved for appeal." State v. Norman , 2010 MT 253, ¶ 16, 358 Mont. 252, 244 P.3d 737. We decline to review Weik's unpreserved arguments on appeal.
CONCLUSION
¶ 27 The District Court's judgment is affirmed except that the District Court is instructed to correct the restitution amount reflected in its written judgment from $47,798.90 to $42,262.06.
We concur:
MIKE McGRATH, C.J.
DIRK M. SANDEFUR, J.
INGRID GUSTAFSON, J.
JIM RICE, J.