FILED

02/24/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0581

DA 23-0581

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2026 MT 32

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

STEPHEN JOSEPH JOHNSON,

      Defendant and Appellant.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. CDC-2021-202
Honorable Kathy Seeley, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Gregory E. Paskell, Attorney at Law, Lynwood, Washington

      For Appellee:

      Austin Knudsen, Montana Attorney General, Cori Losing, Assistant Attorney General, Helena, Montana

      Kevin Downs, Lewis and Clark County Attorney, Helena, Montana

               Submitted on Briefs:  October 22, 2025

                   Decided:  February 24, 2026

Filed:

_____
             Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1      Steven Joseph Johnson (Johnson) appeals his conviction for Criminal Mischief, Burglary, and Bail Jumping entered on May 22, 2023, in the First Judicial District Court, Lewis and Clark County.  We affirm.

¶2      We restate the issue on appeal as follows:

*Whether the District Court violated Johnson's right of confrontation by allowing the State's witness to testify in real time by two-way videoconferencing.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3      This case stems from what appears to be a very brief friendship between Johnson and a resident of Helena, Montana, Kimberly McWhiney (McWhiney).  The two met in late April of 2021.  Around the same time, McWhiney entered into an agreement with a third party, John Herrin (Herrin), for the purchase of a GMC Terrain.  McWhiney was to make a down payment of $1,500, make monthly payments of $200, and receive possession of the GMC while Herrin retained title until she paid off the loan.  McWhiney was very excited to own the GMC as that had been the most expensive purchase in her lifetime and the vehicle was in good condition.  The parties met on a Friday afternoon to complete the sale.  Seeing McWhiney's excitement to own the GMC, Herrin permitted her to drive it home that day under the condition that she would not drive it over the weekend and would obtain insurance the following Monday.  The witnesses gave conflicting testimony as to whether Johnson was present when McWhiney took possession of the GMC.

¶4      Two days later, on April 25, 2021, McWhiney reported the GMC missing to law enforcement.  The following day, on April 26, 2021, the GMC was spotted at a casino

2

around noon. McWhinney's son, Travis Stewart (Stewart), immediately drove there and saw Johnson exit the establishment and enter the GMC. Stewart attempted to block Johnson from exiting the parking lot with the GMC, yet Johnson was able to evade Stewart. Stewart proceeded to follow Johnson. The witnesses gave conflicting testimony as to how close Stewart followed Johnson, but Johnson lost control of the GMC at an intersection while traveling at a high rate of speed. Johnson crashed through a residential fence, a small tree, a swing set, and then a shed before coming to a stop. The swing set and a large section of the fence were destroyed. The crash caused damage to the shed doors and knocked over a Harley-Davidson parked in the shed, breaking the lens cap. The total damages to the GMC were approximately $6,000.

¶5     Johnson exited the GMC and fled on foot, hopping several eight-foot-high fences before entering a garage belonging to Eugene Maw (Maw). About forty-five minutes later, Maw arrived home and learned that law enforcement was searching for a suspect. Maw went downstairs into his pantry and discovered the seal to a jar of water had been broken and it appeared someone had taken a drink from it. Maw noticed a door and a window screen were ajar, which was unusual for his household, and began inspecting the premises. He found a large moving box out of place in his garage and discovered a scared Johnson crouched down behind it. Maw then walked away through his home to alert law enforcement. Johnson followed Maw at a short distance but did not threaten him. Johnson was apprehended by law enforcement on the second floor of Maw's split-level home.

¶6     The State first filed an Information on May 6, 2021, and later filed an Amended Information adding Criminal Mischief and Burglary on July 26, 2021. Johnson failed to

3

appear for several court appearances and thus the State filed a Second Amended Information, adding Bail Jumping, for which Johnson was arraigned on June 30, 2022. The District Court ultimately held a trial beginning on January 9, 2023. During the approximate 18-month delay, Maw relocated to Burbank, Washington. The State filed an opposed motion for Maw to testify by live, two-way videoconferencing based on the facts that Maw was now residing in Burbank, Washington, which is approximately 450 miles from Helena, Montana; Maw was 86 years old; Maw had to be present at home in the mornings and afternoons to ensure his two adopted children, ages seven and nine, could get on and off the school bus each day and were cared for in his home; and Maw needed to accompany his wife, who was 79, to dialysis three times a week. Given these circumstances, the State argued it was both impractical and overly burdensome upon Maw to travel to Helena during the winter to testify in person when Johnson's failure to appear was the cause of the delayed trial. The State further argued that Maw's unique circumstances combined with the important public policies of holding people accountable for their alleged offenses provided adequate justification for Maw to appear by video. Finally, Maw expressed a desire to participate in the trial. The District Court granted the State's motion after oral argument.

¶7 At trial, Maw was sworn in after some initial technical difficulty and then testified by live, two-way video where the record does not show any communication difficulties during his testimony. Maw testified to the circumstances leading to his encounter in his garage with Johnson and that he did not give permission to Johnson to be in his home. On cross-examination, Maw conceded that he did not actually witness Johnson remove the screen from the window or move the box in the garage. Johnson testified on his own behalf

4

and frequently referred to Maw's testimony in support of his assertion that Maw was unthreatened by his presence in Maw's home. The jury returned a verdict of guilty to Criminal Mischief, Burglary, and Bail Jumping.

## STANDARD OF REVIEW

¶8 "This Court exercises plenary review of constitutional questions and applies de novo review to a district court's constitutional interpretation of the Sixth Amendment of the United States Constitution and Article II, Section 24 of the Montana Constitution." *State v. Whitaker*, 2024 MT 255, ¶ 16, 418 Mont. 501, 558 P.3d 741 (quoting *State v. Walsh*, 2023 MT 33, ¶ 7, 411 Mont. 244, 525 P.3d 343); *State v. Bailey*, 2021 MT 157, ¶ 17, 404 Mont. 384, 489 P.3d 889.

## DISCUSSION

¶9 Johnson makes several arguments for why his right to confrontation was violated by Maw's remote testimony. Johnson argues that the record does not support a finding of good faith by the State attempting to make Maw's physical appearance possible, that the State's reasons for Maw's remote testimony are premised upon judicial economy, and that the error was prejudicial because Maw's testimony was necessary for the burglary conviction. The State responds that the District Court properly applied the test for remote testimony in *Maryland v. Craig* and emphasized the burden on Maw and his family if he was required to make a seven-hour drive during winter to testify in person. 497 U.S. 836, 110 S. Ct. 3157 (1990). The State further notes that this Court has described, on two prior occasions, that the first prong of the *Craig* test requires a showing of the witness's unavailability. The State seeks clarification that the first prong in *Craig* requires a showing

5

that the denial of physical face-to-face confrontation is necessary to further an important public policy, not that the witness is unavailable. *See State v. Strommen*, 2024 MT 87, ¶ 19, 416 Mont. 275, 547 P.3d 1227 (stating that the first prong in *Craig* requires an "unavailable" witness); *State v. Hogues*, 2024 MT 304, ¶ 29, 419 Mont. 322, 561 P.3d 1 (same). The State also notes that in *Strommen* and *Hogues* this Court imposed a requirement of good faith upon the State to attempt to secure the witness's presence and maintains that this likewise is a departure from the *Craig* test. *Strommen*, ¶ 19; *Hogues*, ¶ 30. We will, in turn, address the State's concerns, which are well taken.

¶10    The Sixth Amendment Confrontation Clause of the United States Constitution provides that "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. Similarly, the Montana Constitution provides that "[i]n all criminal prosecutions the accused shall have the right . . . to meet the witnesses against him face to face[.]" Mont. Const. art. II, § 24. While we note that the text of the two clauses is not identical, with the Montana provision requiring "face to face" confrontation, the parties have not asked us to interpret differently the two provisions, and we have not done so heretofore. Of course, Montana's Constitution offers broader protection than its federal counterpart. *See State v. Weik*, 2018 MT 213, ¶ 14, 392 Mont. 415, 427 P.3d 52. ("Although we recognize Montana's Confrontation Clause affords broader protections than its federal counterpart and includes the express term 'face-to-face,' we have held also that it does not always require literal face-to-face communication between the defendant and witness."); *State v. Stock*, 2011 MT 131, ¶ 28, 361 Mont. 1, 256 P.3d 899. However, the central purpose of the Confrontation Clause

6

remains, under both the federal and Montana Constitutions, to "ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Craig*, 497 U.S. at 845, 110 S. Ct. at 3163; *State v. Mercier*, 2021 MT 12, ¶ 16, 403 Mont. 34, 479 P.3d 967 (quoting the same). "It is always more difficult to tell a lie about a person 'to his face' than 'behind his back.' In the former context, even if a lie is told, it will often be told less convincingly." *Coy v. Iowa*, 487 U.S. 1012, 1019, 108 S. Ct. 2798, 2802 (1988). Long-established precedent shows that "the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial," which "must occasionally give way to considerations of public policy and the necessities of the case." *Craig*, 497 U.S. at 849, 110 S. Ct. at 3165 (quotations omitted; emphasis in original). The elements of the *Craig* test require: (1) case-specific findings that remote testimony is necessary to further an important public policy and (2) the testimony "does not impinge upon the truth-seeking or symbolic purposes of the Confrontation Clause." *Craig*, 497 U.S. at 851-52, 110 S. Ct. at 3166-67. The first prong, necessity, "must of course be a case-specific one" based on evidence before the trial court. *Craig*, 497 U.S. at 855, 110 S. Ct. at 3169 (citations omitted).

¶11 In *Craig* the United States Supreme Court considered whether Maryland's statutory provision permitting a child victim to testify in another room where the child was examined and cross-examined before live, one-way closed-circuit television shown to the judge, jury, and defendant violated the Confrontation Clause. *Craig*, 497 U.S. at 840-42, 110 S. Ct. at 3160-61. Before the child victim could be permitted to testify in this manner, the trial court was required to "determin[e] that testimony by the child victim in the courtroom will result

7

in the child suffering serious emotional distress such that the child cannot reasonably communicate." *Craig*, 497 U.S. at 840-41, 110 S. Ct. at 3160-61 (citation omitted; brackets in original). The Court reasoned that the presence of these individualized findings together with "other elements of confrontation—oath, cross-examination, and observation of the witness' demeanor—adequately ensures that the testimony is both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony . . . ." *Craig*, 497 U.S. at 851-52, 110 S. Ct. at 3166-67. When these factors are met, this form of testimony does not violate the Confrontation Clause because it is necessary to further an important public policy. In contrast, the Court in *Coy* considered an Iowa statute which did not require case-specific findings of necessity and held that "something more than the type of generalized findings underlying such a statute is needed when the exception [to the Confrontation Clause] is not 'firmly . . . rooted in our jurisprudence.'" *Coy*, 487 U.S. at 1020-21, 108 S. Ct. at 2803 (quoting *Bourjaily v. United States*, 488 U.S. 171, 183, 107 S. Ct. 2775, 2782 (1987)). Hence, the test in *Craig* requires individualized findings that remote testimony is (1) necessary to further an important public policy, and (2) that the reliability of the testimony is otherwise assured through the hallmarks of confrontation—the "non-physically present witness must be under oath and understand the seriousness of his or her testimony, be subject to cross-examination, and permit assessment of the witness's veracity by the factfinder." *Mercier*, ¶ 21 (citations omitted).

¶12    This Court has discussed at length the application of the Confrontation Clause of the Montana and United States Constitutions to live, two-way video testimony. *Whitaker*,

8

¶ 20 (collecting cases). In *City of Missoula v. Duane*, we observed how the live, two-way videoconference there preserved the hallmarks of confrontation addressed in *Craig* in contrast to the "disembodied voice" of the telephonic testimony in *State v. Bonamarte*, 2009 MT 243, 351 Mont. 419, 213 P.3d 457. 2015 MT 323, ¶ 20, 380 Mont. 290, 355 P.3d 729. We further noted that the prohibitive expense and significant burden on the out-of-state witness if he was required to attend three separate trials against three defendants for the same offense justified the witness's remote testimony by live, two-way videoconferencing. *Duane*, ¶ 21. In contrast, we have found Confrontation Clause violations where the State's justification was based solely on judicial economy and the travel costs of bringing an out-of-state witness to provide in-person testimony. *Mercier*, ¶¶ 26-28; *Bailey*; ¶¶ 43-45.

¶13 Much of our recent case law has evolved in the context of the Covid-19 pandemic where public health advisories and travel restrictions created a "substantial financial and logistical impracticality" to securing the witness's physical presence. *Walsh*, ¶ 5. Due to the exigent circumstances of the pandemic, this Court focused on the potential public health exposure to the witness, court, and jury in bringing in an out-of-state witness to testify in person. *Walsh*, ¶ 11; *Whitaker*; ¶ 24. In *Walsh*, the witness would have had to travel from Greece during the pandemic, and the trial court made specific findings regarding flight time, multiple layovers in airports, and governmental advisories noting health concerns and warning against travel. *Walsh*, ¶ 11. In *Whitaker*, the witness was a long-term inmate, first in a local facility and then in federal prison and thus presented a higher risk of becoming infected with Covid-19 and of transferring it to others. *Whitaker*, ¶ 24. Even against the

9

backdrop of the pandemic, we have consistently held that "judicial economy, added expense, or inconvenience alone are not important public policies sufficient to preclude the constitutional right of a defendant to face-to-face confrontation at trial." *Whitaker*, ¶ 22, (quoting *State v. Martell*, 2021 MT 318, ¶ 12, 406 Mont. 488, 500 P.3d 1233).

¶14 In both *Walsh* and *Whitaker*, for example, the witnesses could have been brought to court for face-to-face confrontation, albeit at great health risk, and thus were technically available to testify in person. This Court's test set forth in *Strommen* and *Hogues* would not, however, have permitted the trial court to proceed by way of two-way videoconferencing because the witnesses were available. In *Strommen*, we required a prosecutorial showing, and corresponding court findings, that "(1) the witness is *unavailable* for personal face-to-face cross-examination in the courtroom, and (2) denial of such personal face-to-face cross-examination is necessary to further an important public policy with the reliability of the testimony otherwise assured." *Strommen*, ¶ 19 (emphasis added; citations omitted). We next found that "[i]mplicit in the required showing . . . is an affirmative showing of a good-faith prosecutorial effort to obtain the witness's presence at trial." *Strommen*, ¶ 19 (emphasis omitted; citations omitted). We applied a similar analysis in *Hogues*, requiring the State demonstrate both a good faith attempt to secure the witness's presence and that the witness was unavailable. *Hogues*, ¶ 28.

¶15 Our analysis and the addition of an "unavailable" and "good faith" requirement drew on *Ohio v. Roberts*, 448 U.S. 56, 100 S. Ct. 2531 (1980) and *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004), which, respectively, involved witnesses that could not be located at all or were prevented from testifying due to spousal privilege.

10

Importantly, *Roberts* and *Crawford* did not involve two-way videoconferencing where the witness *is* available to testify. Rather, *Roberts* and *Crawford* involved the admission of testimonial *hearsay* of a witness who could not testify at trial due to *physical or legal unavailability*, and the impact of such testimonial hearsay on a defendant's constitutional right of confrontation. *Roberts*, 448 U.S. at 58-60, 100 S. Ct. at 2535-36; *Crawford*, 541 U.S. at, 40, 124 S. Ct. at 1357-58. Here, it is the face-to-face aspect of confrontation that is at issue, not availability. Because the witness testifying by two-way videoconferencing *is* available, the "unavailability" requirement does not factor into the first prong of the *Craig* test. Similarly, the "good faith" requirement to secure a witness's presence at trial does not factor into the first prong of the *Craig* test, because it applies to a witness who is not available for trial and not a witness who is available to testify but requesting to do so through live, two-way videoconferencing. Accordingly, we clarify and reaffirm that the proper test for remote witness testimony is the two-prong test first set out in *Craig* and applied on numerous occasions by this Court, which requires that the denial of physical face-to-face confrontation be necessary to further an important public policy, be substantiated by case-specific findings, and that the remote testimony otherwise preserves the hallmarks of confrontation. *Craig*, 497 U.S. at 851-52, 110 S. Ct. at 3166-67; *Mercier*, ¶ 18; *Walsh*, ¶ 10; *Whitaker*, ¶ 21.

¶16     Here, the record demonstrates case-specific findings, viewed in their totality, which showed that Maw's remote testimony furthered an important public policy beyond mere judicial economy. Initially, Johnson's failure to appear at his court hearings caused the delay to his trial. At no point in the interim did Johnson seek to interview Maw to learn

11

more about his proffered testimony. Maw was eager to participate in Johnson's trial and to hold him accountable but was prevented from testifying in-person due to his extraordinary family circumstances. Maw was an 86-year-old man living approximately 450 miles from the trial which was scheduled to take place in the winter months. He also was, in part, the primary caretaker for his two adopted daughters, aged seven and nine. He cared for his aging wife who he accompanied to dialysis three times a week. Under these circumstances, the denial of face-to-face confrontation was necessary to serve the important public policy of holding Johnson accountable through a trial and protecting the significant familial interests of Maw in remaining in Washington. The 450-mile or so distance between Burbank, Washington, and Helena, Montana, only exacerbated the logistical challenges of securing Maw's physical presence. Maw's unique family circumstances, his role as a primary caretaker, the large distance between his home and Johnson's trial, as well as Johnson's own role in delaying his trial support a finding that Maw's remote video testimony furthered an important public policy.

¶17 Turning to the hallmarks of confrontation, Maw was duly sworn before testifying by live, two-way videoconferencing. The record does not reveal any communication barriers during cross-examination. Johnson's counsel effectively cross-examined him, getting Maw to concede that he did not actually witness Johnson remove the window screen or relocate the large moving box in the garage. Indeed, Johnson himself relied on Maw's testimony to paint a sympathetic picture of a non-threatening man seeking to escape a stranger who attempted to block him in a parking lot and then followed behind him down the road at a high rate of speed before forcing him off the road where he lost control of the

12

GMC. By all accounts, Maw's remote testimony under these circumstances preserved the necessary hallmarks of confrontation.

## CONCLUSION

¶18 The District Court did not err when it granted the State's motion for Maw to testify by two-way videoconferencing. The District Court made individualized factual findings that given Maw's extraordinary family circumstances and his role as a primary caretaker to his aging wife and two young children, the denial of face-to-face confrontation was necessary to further an important public policy. Additionally, the District Court correctly determined the second prong of the *Craig* test was satisfied because the reliability of Maw's testimony was otherwise assured through his taking an oath, being subject to cross-examination, and because the jury was able to observe his demeanor. Finally, we clarify, based on the reasoning we have set forth, that application of the *Craig* test to two-way videoconferencing does not require a prosecutorial showing of a witness's unavailability or that the prosecution made a good-faith effort to secure their presence at trial.

¶19 Johnson was not denied his constitutional right of confrontation. His conviction is affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ CORY J. SWANSON
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ JIM RICE

13