No. 96-463

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 78

STATE OF MONTANA,

Plaintiff and Respondent,

vs.

ALEXANDER FREDRICK MacKINNON,

Defendant and Appellant.

APPEAL FROM:   District Court of the Fourth Judicial District,
In and for the County of Missoula,
The Honorable John W. Larson, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Margaret L. Borg, Marcia M. Jacobson, Public Defender
Office, Missoula, Montana

For Respondent:

Joseph P. Mazurek, Attorney General, John Paulson, Assistant
Attorney General, Helena, Montana; Robert L. "Dusty"
Deschamps III, Missoula County Attorney, Karen Townsend,
Deputy Missoula County Attorney, Missoula, Montana

Submitted on Briefs: July 2, 1997

Decided: April 9, 1998
Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1    This is an appeal from the Fourth Judicial District Court, Missoula County. On October 17, 1995, a jury found Defendant Alexander MacKinnon (MacKinnon) guilty of felony sexual assault of his step-daughter, M.G.  On March 29, 1996, the District Court entered judgment against MacKinnon. From this judgment and certain evidentiary rulings, MacKinnon appeals.  We affirm.

¶2    We restate the following issues raised on appeal:

¶3    1.    Did the District Court abuse its discretion by allowing the State to present testimony concerning MacKinnon's statements which he made on July 16, 1995, in the presence of the victim, M.G., M.G.'s mother and his ex-wife, Monica, as well as two church members, John and Coleen Contos?

¶4    2.    Did the District Court abuse its discretion by ruling that MacKinnon's ex-wife, Monica, could not be cross-examined about prior sexual abuse of herself and her daughter, M.G.?

FACTUAL AND PROCEDURAL BACKGROUND

¶5    On May 1, 1995, an Information was filed with the Fourth Judicial District Court, Missoula County, charging MacKinnon with committing the offense of felony sexual assault, in violation of § 45-5-502, MCA (1993).  The Information alleged that, in a continuing course of conduct over the previous four years, MacKinnon had knowingly subjected his nine-year-old step-daughter, M.G., to sexual contact without consent by rubbing her breasts and vaginal area.  On May 10, 1995, MacKinnon pleaded not guilty to the charge, thereafter, a trial date was set to begin October 13, 1995.  On May 22, 1995, M.G.'s mother, Monica, and MacKinnon were divorced.

¶6    In April 1995, Monica became active in the Missoula Christian Church (the Church) and became a member in June 1995.  Thereafter, MacKinnon also became active in the Church, but he did not become a member until October 1995.  The  Church was formed in August 1994 in Missoula, Montana, as a branch of the same church located in Denver, Colorado.  John Contos, Coleen Contos and Ken Edwards, witnesses in this action, moved to Missoula from Denver to help form the church and all have responsibilities within the church as group leaders.  However, the Church is headed by an ordained minster who conducts church services and is licensed to perform marriages.  As a part of its Bible-based teachings, the Church allows its members to confess their sins to one another, but no church member has the authority to formally forgive sins.  Rather, the Church believes forgiveness only comes from God.

¶7    On July 16, 1995, after an evening church service conducted in a Missoula restaurant, which both Monica and MacKinnon had attended, Monica and M.G. encountered MacKinnon in the parking lot.  An argument ensued concerning visitation of Monica's and MacKinnon's two boys.

Thereafter, MacKinnon began talking to M.G. and apologizing to her, apparently to set things right with her so she would not have to testify at court proceedings. Concerned with the nature of this conversation, Monica suggested that they continue the conversation inside the restaurant in the presence of John and Coleen Contos. As a result of Monica's suggestion, the conversation continued in the back of the lobby area of the restaurant with everyone sitting on chairs. Subsequently, on August 21, 1995, a second conversation took place at the home of John Contos involving MacKinnon, Monica, John Contos and Ken Edwards.

¶8    On October 12, 1995, the State filed a memorandum in support of the use of statements made by MacKinnon in both the July 16, 1995 and the August 21, 1995 conversations. In response, MacKinnon filed a motion in limine and a motion to suppress concerning these statements and a related document. On October 13, 1995, prior to commencing jury selection, the District Court heard testimony and argument concerning these motions, and, thereafter, granted MacKinnon's motion to suppress the document and his August 21, 1995 statements, but allowed testimony concerning his July 16, 1995 statements.

¶9    On October 16, 1995, a jury trial was held. During a break in the trial and outside the presence of the jury, the State moved the District Court to prevent MacKinnon from cross-examining Monica or M.G. concerning two prior incidents of sexual abuse, one involving sexual abuse of Monica by a family member when she was a child and the other involving sexual abuse of M.G. by her natural father when she was an infant. The State argued that testimony as to these two matters should not be allowed because this evidence would not be probative of Monica's truthfulness and would be prejudicial and confusing to the jury. MacKinnon pointed out that, as agreed, he did not question M.G. as to these matters. However, MacKinnon argued that he was entitled to cross-examine Monica as to these matters under the confrontation clause of the federal and Montana constitutions to prove her lack of credibility by revealing any possible motive, prejudice or bias that Monica might have.

¶10   The District Court ruled that under Rules 403 and 608, M.R.Evid., MacKinnon could not cross-examine Monica as to these two matters to establish her motivation because there was no contradictory statement to tie into and because even if this evidence had some probative value it was greatly outweighed by its prejudicial effect. However, the court ruled that MacKinnon could present expert testimony concerning matters of child sexual abuse to assist the jury in evaluating M.G.'s testimony. Furthermore, the court agreed that MacKinnon could argue in closing as to Monica's motive, bias, and prejudice based on other facts in evidence, such as M.G.'s reluctance to testify and Monica's desire to divorce MacKinnon. MacKinnon chose not to present expert testimony and called no witnesses before resting his case. However, in closing argument, MacKinnon did point out the family's troubled situation, Monica's haste to report M.G.'s disclosures to the police as well as her haste to divorce MacKinnon.

¶11   On October 17, 1995, the jury returned a verdict of guilty to the charge of felony sexual assault against MacKinnon. Thereafter, the District Court conducted a sentencing hearing on March 6, 1996, and deferred MacKinnon's

imposition of sentence for six years, placing MacKinnon on probation subject to certain conditions.  The District Court entered its written judgment on March 29, 1996.  From this judgment and certain evidentiary rulings, MacKinnon appeals.

## STANDARD OF REVIEW

¶12  Both issues MacKinnon raises on appeal concern the District Court's evidentiary rulings made during his trial.  We review a district court's evidentiary rulings to determine whether the district court abused its discretion.  State v. Anderson (1996), 275 Mont. 344, 347, 912 P.2d 801, 803 (citing State v. Pace (1995), 272 Mont. 464, 466, 901 P.2d 557, 559).  A district court has broad discretion to determine whether evidence is relevant and admissible.  Anderson, 275 Mont. at 347, 912 P.2d at 803.  Therefore, absent a showing of abuse of discretion, we will not overturn a court's evidentiary determination.  Anderson, 275 Mont. at 347, 912 P.2d at 803.

## DISCUSSION

¶13  At the outset, we note that MacKinnon's appellate brief contains numerous assertions and exhibits which are not supported by or contained in the District Court record on appeal.  Specifically, MacKinnon includes in his appendix to his appellate brief:  Exhibit A (a motion and proposed order to dismiss this action prepared by the State but which was never filed); Exhibit B (a letter written by the State to Monica explaining the reason for dismissal); Exhibit D (a transcript of a taped interview with M.G. conducted by the Missoula County Sheriff's Department); and Exhibit E (a photocopy of the cover of the book titled "Gilly's Secret" along with a letter from Rashel Jeffrey, M.S.W., A.C.S.W., stating she loaned this book to M.G.).  However, these documents (B, D and E) were not introduced as exhibits during trial and are not a part of the District Court record.  Furthermore, although Exhibit F (a sexual offender evaluation) is referenced in the District Court's minute entries of February 14, 1996, and March 6, 1996, it is not included in the District Court record and the transcript of the sentencing hearing conducted on March 6, 1996, was not included with the trial transcript on appeal either.

¶14  Additionally, in his appellate brief, MacKinnon makes assertions concerning the book, "Gilly's Secret," which M.G. may have read, the results of two polygraph examinations, the sexual offender evaluation, Monica's motives at the time of the July conversation, MacKinnon's motivations and state of mind, and contacts between MacKinnon and Monica.  None of these assertions are supported by the record.  As the State points out, MacKinnon did not testify at the trial or sentencing hearing, and evidence concerning these assertions was not offered or received.

¶15  We continue to condemn this practice and again "remind counsel that parties on appeal are bound by the record and may not add additional matters in briefs or appendices."  State v. Hatfield (1993), 256 Mont. 340, 344, 846 P.2d 1025, 1028 (citing State v. Puzio (1979), 182 Mont. 163, 164, 595 P.2d 1163, 1164).  We will not tolerate an attempt to introduce extraneous information into the proceedings.  State v. Hall (1983), 203 Mont. 528, 540, 662 P.2d 1306, 1312 (citing Farmers State Bank of Conrad v. Iverson and Bouma (1973), 162 Mont. 130, 509 P.2d 839).  Consequently, we review the

following two issues concerning the District Court's evidentiary rulings based only upon the evidence contained in the District Court record.

¶16  1.    Did the District Court abuse its discretion by allowing the State to present testimony concerning MacKinnon's statements which he made on July 16, 1995, in the presence of the victim, M.G., M.G.'s mother and his ex-wife, Monica, as well as two church members, John and Coleen Contos?

¶17  During pretrial proceedings on October 12, 1995, the State filed a memorandum in support of the use of certain statements made by MacKinnon in a July 16, 1995 conversation involving himself, Monica, M.G., and John and Coleen Contos and statements made by MacKinnon in an August 21, 1995 conversation involving himself, Monica, John Contos and Ken Edwards.  In turn, MacKinnon filed a motion in limine and a motion to suppress regarding these same statements as well as a related document.  On October 13, 1995, prior to jury selection, the District Court heard testimony and argument concerning the admissibility of the July and August statements under Montana's clergy-penitent privilege, § 26-1-804, MCA.

¶18  Specifically, the District Court heard testimony concerning the status of John Contos, Coleen Contos and Ken Edwards within the Missoula Christian Church, the structure and discipline of the Church, as well as the circumstances surrounding the July and August conversations.  Thereafter, the District Court granted MacKinnon's motion to suppress the document. However, while the District Court also denied admission of statements made by MacKinnon during the August conversation, the court ruled that Monica, M.G., John Contos and Coleen Contos could testify as to statements made by MacKinnon during the July conversation.

¶19  On appeal, MacKinnon argues that the District Court abused its discretion when it allowed Monica, M.G., John Contos and Coleen Contos to testify about statements he made during the July conversation.  He asserts that testimony given by John and Coleen Contos was inadmissible under § 26-1-804, MCA, because the Contoses, in their professional character as clergy persons, and in the course of discipline enjoined by the Church, heard him confess the crime with which he had been charged two months previously. Additionally, MacKinnon asserts that Monica and M.G. should not have been allowed to testify about his statements because the July conversation was analogous to compromise negotiations and conciliation counseling. Furthermore, MacKinnon contends that because of the religious setting, he trusted that his statements would be kept confidential.  Ultimately, MacKinnon claims that Monica coerced and tricked him into confessing.

¶20  Section 26-1-804, MCA, provides:
    Confessions made to member of clergy.  A clergyman or priest cannot, without the consent of the person making the confession, be examined as to any confession made to him in his professional character in the course of discipline enjoined by the church to which he belongs.

¶21  Enacted in 1867, § 26-1-804, MCA, was left unchanged by the adoption of the Montana Rules of Evidence.  See Commission Comments to Article V: Privileges,  M.R.Evid.  Despite this statute's long history, we are presented for the first time with an issue involving its  application.  In considering the application of this statute, we note that the United States Supreme Court has explained:

>      Testimonial exclusionary rules and privileges contravene
> the fundamental principle that " 'the public . . . has a right to
> every man's evidence.' "  As such, they must be strictly
> construed and accepted "only to the very limited extent that
> permitting a refusal to testify or excluding relevant evidence has
> a public good transcending the normally predominant principle
> of utilizing all rational means for ascertaining truth."

Trammel v. United States (1980), 445 U.S. 40, 50, 100 S.Ct. 906, 912, 63 L.Ed.2d 186, 195 (citations omitted).  Additionally, we note that interpretations in other jurisdictions of clergy-penitent statutes similar to § 26-1-804, MCA, have varied.  See e.g.  State v. Buss (Wash.App. Div. 1 1995), 887 P.2d 920, and  Scott v. Hammock (Utah 1994), 870 P.2d 947.

¶22  The Washington Court of Appeals, in Buss, addressed the issue of whether a defendant's incriminating statements made to a non-ordained Catholic church counselor during a counseling session were privileged under Washington's statutory clergy-penitent privilege.  Narrowly interpreting their clergy-penitent statute, the court explained that non-ordained church counselors are not "clergy" within the statute.  The court further explained that the terms "confession" or "course of discipline" only include the sacrament of confession authorized by a particular church discipline.  Because the church counselor was not a clergy member and the counseling session did not amount to a confession, the court held that the privilege did not apply.  Buss, 887 P.2d at 923-24.

¶23  In contrast, the Utah Supreme Court, in Scott, broadly interpreted their statutory clergy-penitent privilege holding that the privilege applied to non-penitential communications between lay persons and clergy if the communications were "made in confidence and for the purpose of seeking or receiving religious guidance, admonishment, or advice and that the cleric was acting in his or her religious role pursuant to the practice and discipline of the church."  Scott, 870 P.2d at 956.  In Scott, the court held that the privilege did apply because the communications between the defendant and his bishop pertained to the defendant's moral conduct, were intended to be confidential, and the bishop was acting in his role as cleric.  Scott, 870 P.2d at 956.

¶24  Notwithstanding that testimonial exclusionary rules and privileges are strictly construed and accepted, Trammel, 445 U.S. at 50, 100 S.Ct. at 912, 63 L.Ed.2d at 195, under the federal First Amendment and under Article II, Section 5 of the Montana Constitution, all persons are guaranteed the free exercise of their religious beliefs and all religions are guaranteed governmental neutrality.  See, for example,  Torasco v. Watkins (1961), 367 U.S. 488, 495, 81 S.Ct. 1680, 1683-84, 6 L.Ed.2d 982, 987; and  Rasmussen v. Bennett (1987), 228 Mont. 106, 111-12, 741 P.2d 755, 758-59.  Thus, in order to minimize the risk that § 26-1-804, MCA, might be discriminatorily applied because of differing judicial perceptions of a given church's practices or

religious doctrine, and in order to least interfere with the federal and Montana constitutional protections of religious freedom referred to above, we conclude that Utah's broader interpretation of the clergy-penitent privilege as set forth in Scott, 870 P.2d 947, is the better view, and we adopt that approach.

¶25  Notwithstanding, even under this broad interpretation of the statute, we conclude that, because the clergy-penitent privilege was not implicated, the District Court did not abuse its discretion when it required John and Coleen Contos to testify about statements MacKinnon made during the July conversation.  First of all, it appears that the District Court assumed that John and Coleen Contos were "clergy persons" for the purposes of MacKinnon's claim of privilege.  Secondly, however, accepting that premise as true, the other facts surrounding the July conversation indicate that any statements MacKinnon made were not directed at John and Coleen Contos in their "professional character," that is, in their capacities as clerics or in their religious roles and "in the course of discipline enjoined," that is, pursuant to the practice and discipline of the Church.  To the contrary, the evidence demonstrates that MacKinnon was not making a confession to the Cantoses for the purpose of receiving forgiveness or for spiritual or religious counseling, guidance, admonishment or advice.  Therefore, § 26-1-804, MCA, did not preclude testimony concerning the July conversation because the statute was never implicated.

¶26  The July conversation, which took place over two months after MacKinnon was charged with felony sexual assault and six weeks after he and Monica divorced, was only a continuation of MacKinnon's conversation with Monica and M.G. which began after evening church services outside the presence of John and Coleen Contos in the parking lot of a Missoula restaurant.  Because Monica felt uncomfortable facing MacKinnon by herself as he attempted to set things right with M.G., she asked MacKinnon to continue their conversation inside the restaurant and she also asked John and Coleen Contos, without explaining the subject of their conversation, to serve as facilitators while she, MacKinnon and M.G. talked.  At Monica's request, their conversation continued in the back of the lobby area of the restaurant, a public place, with everyone sitting on chairs.  No representations of confidentiality were made during their conversation.

¶27  Even assuming that John and Coleen Contos were clergy persons in the church, nothing in the record suggests that they were acting as ministers or counselors at the time they facilitated the July conversation.  MacKinnon, not yet a church member at the time of the July conversation, had not previously sought spiritual advice or counseling from either John or Coleen Contos.  Further, MacKinnon did not ask to meet with John and Coleen Contos for the purpose of confession or for religious guidance, counseling, admonishment or advice.  Rather, Monica requested that John and Coleen Contos be present during the July conversation, but only to serve as facilitators.  Moreover, during the July conversation, MacKinnon did not ask for, and the Contoses did not give, any spiritual advice or forgiveness.  No prayers were given and nothing was said about forgiveness.  Rather, MacKinnon volunteered his statements without apparent encouragement in order to set things right with his step-daughter, M.G., so that she would not have to testify at court proceedings. In this regard, MacKinnon's statements were directed at Monica and M.G., not

the Contoses. Finally, MacKinnon had no reasonable expectation that his statements would be held in confidence. MacKinnon did not seek and the Contoses did not make any representations of confidentiality. Instead, MacKinnon made his statements in a public place to his ex-wife and step-daughter in the presence of the Contoses.

¶28 Furthermore, we agree with the State that the District Court did not abuse its discretion when it allowed Monica and M.G. to testify about statements MacKinnon made during the July conversation. Contrary to MacKinnon's arguments, this conversation was not analogous to compromise negotiations or conciliation counseling, and, therefore, was not confidential. First, MacKinnon made his statements to his former wife and step-daughter in the back of the restaurant lobby, a public place, and no representations of confidentiality were made. Additionally, John and Coleen Contos testified that when the July conversation took place they both knew that Monica and MacKinnon were divorced and that they did not advise Monica or MacKinnon about the resumption of their marriage; they did not offer any spiritual advice or counseling; and they did not suggest any further course of action. As such, MacKinnon's analogies to compromise negotiations and conciliation do not accurately reflect the substance and tenor of the July conversation. Because MacKinnon did not testify, there is no evidence as to his motives for engaging in the conversation nor any evidence as to his state of mind or his expectations of confidentiality. In short, no evidence suggests that MacKinnon had any reasonable expectation that his statements would be held in confidence. Finally, contrary to MacKinnon's assertions, no evidence presented shows that Monica in any way coerced or tricked MacKinnon into confessing for the purpose of gaining evidence for the State.

¶29 Having carefully considered the evidence in the record, we conclude that § 26-1-804, MCA, is not implicated in this case. Furthermore, we conclude that the July conversation was not confidential in nature. Accordingly, we hold that the District Court did not abuse its discretion when it allowed testimony concerning statements MacKinnon made during the July 16, 1995 conversation.

¶30 2. Did the District Court abuse its discretion by ruling that MacKinnon's ex-wife, Monica, could not be cross-examined about prior sexual abuse of herself and her daughter, M.G.?

¶31 MacKinnon argues that the District Court abused its discretion when it ruled that MacKinnon could not cross-examine his ex-wife, Monica, about two prior incidents of sexual abuse, one involving sexual abuse of Monica by a family member when she was a child and the other involving sexual abuse of M.G. by her natural father when she was an infant. MacKinnon does not contend that Monica lied; rather, he simply contends that Monica's personal problems may have affected her perception of M.G.'s initial statements that MacKinnon had touched her in inappropriate places and caused Monica to overreact. As such, MacKinnon argues this evidence of Monica's personal problems would show her bias, prejudice and motive to testify. Furthermore, MacKinnon maintains that he was entitled to this testimony under the compulsory process and confrontation clauses of the federal and Montana constitutions.

¶32   The State argues that the District Court properly limited the cross-examination of Monica by prohibiting inquiry into these two prior unrelated incidents of sexual abuse involving Monica and M.G.  Specifically, the State asserts that the court properly prohibited inquiry into the prior unrelated incident of sexual abuse against M.G. when she was an infant pursuant to Montana's rape shield statute, § 45-5-511(2), MCA.   Furthermore, the State contends that on the basis of Rules 401, 403 and 608(b), M.R.Evid., the court properly prohibited inquiry into the prior unrelated incident of sexual abuse against Monica when she was a child.  We agree.

¶33   We have previously explained:

> The defendant's right to confront and cross-examine an adverse witness is grounded in the Sixth Amendment to the United States Constitution, and Article II, Section 24, of the Montana Constitution.  However, limiting the scope of cross-examination does not necessarily violate a defendant's right to confront an adverse witness.  A trial court has broad discretion to limit the scope of cross-examination to those issues it determines are relevant to the trial.

State v. Sullivan (1994), 266 Mont. 313, 323, 880 P.2d 829, 836 (citing Sloan v. State (1989), 236 Mont. 100, 104-05, 768 P.2d 1365, 1368, and United States v. Kennedy (9th Cir. 1983), 714 F.2d 968, 973, cert. denied, 465 U.S. 1034 (1984)).

¶34   Montana's rape shield statute, § 45-5-511(2), MCA, prohibits introduction of evidence concerning the victim's prior sexual conduct, with certain exceptions:

> No evidence concerning the sexual conduct of the victim is admissible in prosecutions under this part except evidence of the victim's past sexual conduct with the offender or evidence of specific instances of the victim's sexual activity to show the origin of semen, pregnancy, or disease which is at issue in the prosecution.

¶35   Inadmissible evidence concerning the past sexual conduct of a victim includes prior sexual abuse.  State v. Weeks (1995), 270 Mont. 63, 89, 891 P.2d 477, 493.  "The purpose of the rape shield statute is to prevent the trial from becoming a trial of the victim."  Weeks, 270 Mont. at 89, 891 P.2d at 493.   Yet, we must balance the victim's protection under the rape shield statute against the defendant's right to confront witnesses. Weeks, 270 Mont. at 89, 891 P.2d at 493.  We have held that a defendant's right of confrontation is not violated by the exclusion of evidence concerning the victim's prior sexual abuse committed by other individuals unless the victim's accusations of prior abuse are proven to be false.  Weeks, 270 Mont. at 89, 891 P.2d at 493; State v. Van Pelt (1991), 247 Mont. 99, 805 P.2d 549.

> "If the charges are true or reasonably true, then evidence of the charges is inadmissible, mainly because of its prejudicial effect, . . . but certainly because of its irrelevance to the instant proceeding. . . . Furthermore, evidence of prior charges which have not been adjudicated to be true or false; i.e., which may be

true or false is also inadmissible, primarily because its introduction circumvents the interest in preserving the integrity of the trial and preventing it from becoming a trial of the victim . . . (reception of evidence which may be true or false allows circumvention of laws designed to protect legitimate interests of [the] victim). These limitations do not infringe upon a defendant's right to confrontation. (Citations omitted; emphasis in original.)"

Van Pelt, 247 Mont. at 104, 805 P.2d at 552-53 (quoting State v. Anderson (1984), 211 Mont. 272, 284-85, 686 P.2d 193, 200).

¶36 Here, the District Court properly concluded that evidence of M.G.'s prior unrelated incident of sexual abuse was inadmissible. Neither of the two statutory exceptions applies in this case. Furthermore, it was not shown that M.G. made any false accusations concerning her prior unrelated incident of sexual abuse. Nor could M.G. have testified about this incident of sexual abuse because at the time it occurred she was only an infant. Accordingly, we hold that the District Court correctly ruled that MacKinnon could not cross-examine Monica concerning M.G.'s prior unrelated incident of sexual abuse.

¶37 Montana's rape shield statute does not apply to other witnesses, and, therefore, would not prohibit MacKinnon from cross-examining Monica about the prior incident of sexual abuse when she was a child. We have stated that "[a] witness's credibility may be attacked through cross-examination to reveal possible biases, prejudices, or ulterior motives if they relate directly to issues or personalities in the case at hand." State v. Short (1985), 217 Mont. 62, 67, 702 P.2d 979, 982. In this regard, Rule 401, M.R.Evid., provides that relevant evidence may include evidence of a witness's credibility. However, Rule 401, M.R.Evid., also states that relevant evidence is any evidence which tends to make the existence of any fact of consequence to the determination of the action more or less probable than without the evidence.

¶38 Here, MacKinnon argues that Monica would have reacted differently to M.G.'s disclosures if the two prior incidents of sexual abuse had not occurred. Specifically, MacKinnon contends that Monica might have made more detailed inquires into what happened and might have taken M.G. to an expert before she rushed to call the authorities within minutes of talking with M.G. However, we conclude that the causes of Monica's reaction to M.G.'s disclosures are not facts of consequence in determining MacKinnon's guilt. See State v. Rendon (1995), 273 Mont. 303, 307-08, 903 P.2d 183, 185-86 (district court did not abuse its discretion in excluding testimony concerning the antagonistic relationship between a testifying witness, the assault victim's mother, and the defendant, which was designed to attack the witness's credibility, as irrelevant to the issue of defendant's guilt). As such these incidents are irrelevant and the District Court properly excluded them. Furthermore, we find no fault with Monica's initial reporting of M.G.'s disclosures to the police who conducted an investigation and determined that the child's statements were credible.

¶39 Additionally, Rule 608, M.R.Evid., prohibits attacks on a witness's general character and credibility through specific instances of conduct, and Rule 403, M.R.Evid., allows a court to exclude relevant evidence if its

probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.  Here, MacKinnon wanted to cross-examine Monica about prior unrelated incidents of sexual abuse--one involving herself when she was a child and the other involving M.G. when she was an infant.  We agree with the State that, on the basis of Rules 608 and 403, M.R.Evid., testimony concerning these prior incidents of sexual abuse would not be probative of Monica's truthfulness, but rather would constitute an attack on her general character and credibility; would create unfair prejudice against Monica; and would confuse the issues for the jury.  See State v. Passama (1993), 261 Mont. 338, 341-42, 863 P.2d 378, 379-80 (district court did not abuse its discretion in prohibiting the defendant from cross-examining the victim's brother about prior instances of sexual misconduct because its prejudicial value outweighed its probative value).  Accordingly, we hold that the District Court did not abuse its discretion when it prohibited MacKinnon from cross-examining Monica about these two prior unrelated incidents of sexual assault.

¶40  Finally, the District Court's ruling did not violate MacKinnon's rights under the compulsory process and confrontation clauses of the Montana and federal constitutions.  The District Court's ruling was narrow in scope and effect.  The court simply restricted MacKinnon from cross-examining Monica about two specific instances of prior unrelated sexual abuse--one involving M.G. when she was an infant and another involving Monica when she was a child.  Otherwise, the court did not restrict MacKinnon's cross-examination of Monica concerning the marital strife within Monica and MacKinnon's marriage or her desire to end their marriage, and the court did not impose any other limitation upon cross-examination.  Furthermore, the court allowed MacKinnon to present closing arguments concerning Monica's motive, bias or prejudice based on evidence in the record.  Under Rule 611, M.R.Evid., the District Court is given considerable discretion in exercising control over interrogation of witnesses.  Accordingly, we hold that the District Court properly exercised its discretion when it limited MacKinnon's cross-examination of Monica.

¶41  Affirmed.

/S/   JAMES C. NELSON

We Concur:

/S/  J. A.  TURNAGE
/S/  KARLA M. GRAY

Justice Terry N. Trieweiler specially concurring.
¶42  I concur with the majority's discussion and conclusion related to Issue 1.
¶43  I specially concur with the majority's conclusion related to Issue 2. Although I agree that the district court has broad discretion to limit the scope of cross-examination and that, based on the specific facts in this case, that discretion was not abused, I do not agree with all that is said in the majority's discussion pertaining to Issue 2.  In particular, I do not want to infer that, as applied to other circumstances, Montana's rape shield statute, found at

§ 45-5-511(2), MCA, might not violate state and federal constitutional rights to cross-examine adverse witnesses. Furthermore, while I agree that the District Court had the discretion to admit or exclude cross-examination of Monica, I do not agree with the inference in the majority opinion that it would have been error for the District Court to allow such examination. I conclude that Monica's past experiences which may have affected her perception of events were relevant to her credibility and could properly have been admitted. However, I also conclude that the District Court could properly have determined that the probative value of that line of questioning was outweighed by the prejudicial effect and, therefore, had a proper basis for exercising its discretion to exclude the evidence.

¶44 For these reasons, I specially concur with the majority opinion.

/S/  TERRY N. TRIEWEILER

Justice William E. Hunt, Sr., joins in the foregoing concurring opinion.

/S/  WILLIAM E. HUNT, SR.