FILED

12/08/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0113

DA 19-0113

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2020 MT 304

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

DARRELL DWAYNE SMITH,

      Defendant and Appellant.

APPEAL FROM:     District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. BDC 18-9
Honorable Michael F. McMahon, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Appellate Defender, Alexander H. Pyle, Assistant Appellate
Defender, Helena, Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General, Katie F. Schulz, Assistant
Attorney General, Helena, Montana

          Leo Gallagher, Lewis and Clark County Attorney, Fallon Stanton, Deputy
County Attorney, Helena, Montana

          Submitted on Briefs:  October 21, 2020

                      Decided:  December 8, 2020

Filed:

_____
               Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1 Defendant and Appellant Darrell Dwayne Smith (Smith) appeals from the Judgment and Commitment filed on December 24, 2018, by the First Judicial District Court, Lewis and Clark County.

¶2 We restate the issue on appeal as follows:

*Whether the District Court made numerous erroneous rulings amounting to cumulative error requiring reversal.*

¶3 We reverse and remand for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 Smith was arrested on December 16, 2017. He was charged with Count I Partner or Family Member Assault (PFMA) (felony) under § 45-5-206(1)(a), MCA; or, in the alternative, Count II PFMA (felony) under § 45-5-206(1)(c), MCA; Count III Stalking (misdemeanor) under § 45-5-220(1)(b), MCA; and Count IV Solicitation (felony), tampering with a witness under §§ 45-4-101 and 45-7-206, MCA. The solicitation charge arose from jailhouse phone calls between Smith and his sister and mother, in which the State alleged Smith encouraged his family to convince his victim, T.W., not to testify.

¶5 During pre-trial conference on the morning of trial, the District Court inquired as to whether the parties were ready to proceed to trial. The State advised, "We will need to make sure that the main witness has arrived before we start jury selection." Upon jurors appearing and after the initial jurors were called forth for voir dire, the State commenced its voir dire with no mention that its main witness was not present. The State informed the

2

jury this was a case dealing with a partner or family member assault and then proceeded to discuss various issues associated with domestic violence. Throughout voir dire, the State concentrated nearly exclusively on the PFMA and stalking issues without ever mentioning anything in regard to the tampering offense. During a conference with the court at a break in voir dire, the State advised the court and Smith that the alleged victim, T.W., was not coming to trial, and the State then moved to dismiss the PFMA and stalking charges.

¶6 Upon the District Court granting the State's motion to dismiss the PFMA and stalking offenses, Smith moved for a mistrial, asserting the jury had been tainted by exposure to allegations of PFMA and stalking with the State's voir dire questioning. The State resisted, asserting the defendant had to know there was a proceeding or investigation happening and the jury was entitled to know the offense and how the person the defendant purportedly attempted to get not to show up is relevant to the offense charged. The District Court then effectively denied Smith's motion for mistrial and proceeded to trial on the remaining solicitation charge. Upon resuming voir dire after the break, the State secured jurors' commitment to follow the law, asked a few questions as whether any of the jurors knew each other, and passed the jury for cause.

¶7 During its opening statement, the State again emphasized the PFMA, advising T.W. "reported to law enforcement that the defendant assaulted her—assaulted her and would not leave her alone." The State told the jury an investigating officer saw T.W. "had visible injury" and viewed T.W.'s phone containing "numerous messages and calls" from Smith. Smith objected to the State's presentation of these other bad acts, noting the original

3

underlying offense did not need to be proven, only that Smith was arrested. The District Court overruled the objection.

¶8 In its case-in-chief, the State introduced extrinsic evidence of other bad acts related to Smith's cell phone to which Smith objected as not relevant, violative of M. R. Evid. 404, and unduly prejudicial. Although Smith had not yet testified, the State asserted the extrinsic evidence was admissible to attack Smith's credibility. The District Court overruled Smith's objections.

¶9 During Smith's case, through cross-examination, the State also admitted extrinsic evidence of other bad acts involving Smith's cell phone and text messages sent prior to the time period involving the tampering charge. Smith objected on the basis of relevance and also beyond the scope of direct. Again, the State asserted it was impeaching Smith's credibility and the District Court overruled the objections.

¶10 Finally, during the State's rebuttal, the State again admitted extrinsic evidence related to jail phone calls that Smith testified he did not recall and phone calls between Smith and an individual named Whitney in relation to a job and a place to reside. Smith again objected based on relevance and M. R. Evid. 404 and 403. Again, the State asserted the evidence was admissible for impeachment and credibility issues, and the District Court overruled the objections.

¶11 The jury convicted Smith of solicitation of witness tampering. Smith was sentenced to Montana State Prison for ten years with four years suspended. As Smith's arrest resulted in revocation of his Department of Corrections conditional release, the District Court did

4

not credit Smith for his pretrial incarceration. Smith appeals not only the conviction but, if upheld, the refusal of the District Court to give him credit for any pretrial incarceration. Because we reverse on cumulative error, we do not address Smith's argument regarding credit for pretrial incarceration. Additional facts will be discussed below as necessary.

## STANDARD OF REVIEW

¶12　We review a trial court's denial of a mistrial for an abuse of discretion. *State v. Criswell*, 2013 MT 177, ¶ 42, 370 Mont. 511, 305 P.3d 760. A court's evidentiary ruling is also reviewed for abuse of discretion. *State v. Cunningham*, 2018 MT 56, ¶ 8, 390 Mont. 408, 414 P.3d 289.

## DISCUSSION

¶13　*Whether the District Court made numerous erroneous rulings amounting to cumulative error requiring reversal.*

¶14　Smith asserts reversal and a new trial is warranted as the District Court made several errors that tainted Smith from receiving a fair trial. First, Smith asserts the jury was tainted by the State's voir dire questioning focusing on charges it intended to dismiss and did indeed dismiss immediately following its extensive questioning of the jury about domestic violence impacts and issues. In light of exposing the jury to very prejudicial allegations of PFMA and stalking against Smith tending to portray Smith as a bad person, Smith asserts the court erred in not declaring a pre-empanelment mistrial. Next, Smith asserts the District Court erred by repeatedly permitting the State to introduce extrinsic, irrelevant, bad acts under the guise of impeaching Smith's credibility. Smith asserts, at a minimum, that the

jury's repeated exposure to other bad acts in voir dire and throughout trial cumulatively deprived him of a fair trial.

¶15 The State counters that informing the jury of the PFMA and stalking allegations against Smith was not the equivalent of informing the jury of prior bad acts. The State further asserts it was not error for the court to admit the extrinsic evidence presented by the State as it was relevant as impeachment evidence to attack Smith's credibility. Finally, the State asserts none of the information was so egregious as to be incurable by the court's admonishment to the jury to decide the case based on the evidence and the court's final instructions on the law.

¶16 This Court recognizes "[t]he cumulative error doctrine mandates reversal of a conviction where numerous errors, when taken together, have prejudiced the defendant's right to a fair trial." *Cunningham*, ¶ 32 (citing *State v. Hardman*, 2012 MT 70, ¶ 35, 364 Mont. 361, 276 P.3d 839). "The defendant must establish prejudice; a mere allegation of error without proof of prejudice is inadequate to satisfy the doctrine." *Cunningham*, ¶ 32. "[P]rejudice may result from the cumulative effect of errors, and . . . the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." 5 Am. Jur. *Appellate Review* § 668 (2007) (footnotes omitted). A Defendant is entitled to a fair trial, not to a trial free from errors. *Cunningham,* ¶ 32. "Where individual errors would be insufficient alone, the sum of these errors can serve as a basis for reversal under the cumulative error doctrine." *Cunningham*, ¶ 32 (citing *Kills on Top v. State*, 279 Mont. 384, 392, 928 P.2d 182, 187 (1996)).

¶17    While the cumulative effect of errors will rarely merit reversal, *Cunningham*, ¶ 33, the errors Smith asserts taken together establish he suffered prejudice.  From our review of the record as a whole, we reluctantly conclude Smith did not receive a fair trial as a result of the District Court's rulings, but instead his conviction resulted, at least in part, from the prejudice of the irrelevant and extrinsic bad acts evidence erroneously admitted from voir dire through the entire evidentiary presentation.

***Voir dire***

¶18    Upon questioning throughout its voir dire, the State obtained reports from jurors of incidents of domestic violence impacting their lives—a juror reported her step-father was abusive to her mother, another reported her first husband abused her, another reported her step-father also abused her mother, another was abused by an ex-boyfriend, another reported two granddaughters being sexually molested, another reported a domestic violence incident where law enforcement told her and her husband to separate for a while, another reported his wife was stalked by a prior boyfriend and his sister was a victim of domestic violence, another reported being a victim of domestic violence as a child and again by her second husband, and most disturbing, another reported her sister's husband had murdered her sister in a domestic dispute and then killed himself.  The State discussed that at times victims did not want to cooperate with law enforcement and invited jurors to provide reasons why a victim would not cooperate.  Not surprisingly, jurors advanced that the victim was embarrassed, ashamed, or still in love with the perpetrator and did not want to hurt him.  The State asked jurors to provide reasons for the State to pursue charges where

the victim does not want to, eliciting responses such as the perpetrator is a danger to society and the need to protect the victim from further abuse.

¶19 As noted by Smith, "any improper influence which has the natural tendency to prejudice the verdict is grounds for a mistrial." *State v. Hardaway*, 1998 MT 224, ¶ 30, 290 Mont. 516, 966 P.2d 125 (quoting *State v. McMahon*, 271 Mont. 75, 80, 894 P.2d 313, 317 (1995)). Improper influences may include inadmissible opinions or comments about a defendant's character or propensities or other bad acts inadmissible under Rule 404(b). *See* M. R. Evid. 404(b); *McMahon*, 271 Mont. at 80, 894 P.2d at 317.

¶20 From our review of the record, there is little doubt the State's voir dire primed jurors to a case centered on PFMA and stalking. It primed jurors to the breadth and extent to which domestic violence permeates and negatively impacts our society. It primed jurors that the reason a victim would not appear to testify was that she was scared, ashamed, or embarrassed, not that the event did not occur and that she did not want her testimony put under the scrutiny of cross-examination. Finally, it primed jurors to the most deadly consequences of domestic violence—one juror's sister was murdered at the hands of her partner—and the compelling need to protect the victim and society even if the alleged victim does not want to cooperate or pursue the prosecution.

¶21 At the pretrial conference on the morning of trial, the State advised the court and Smith, "We will need to make sure that the main witness has arrived before we start jury selection." By its nature, this statement would naturally lead the court and opposing counsel to assume the State would not start its voir dire unless its main witness had arrived.

8

At a minimum, the court and Smith would have a reasonable expectation that prior to commencing its voir dire, the State would advise the Court and Smith if its main witness had not arrived. As the State proceeded with voir dire without further mention of its main witness, the court and Smith were left to reasonably conclude the State's main witness had arrived when she had not. The voir dire questions and issues advanced by the State would have been non-objectionable if the case were proceeding on the PFMA and stalking offenses charged. The way in which the State proceeded through voir dire, concentrating on PFMA and stalking issues and then immediately dismissing the PFMA and stalking charges after covering these issues, effectively precluded Smith from making objections to the State's line of questioning that would have reasonably been expected if the case were proceeding only on a solicitation to tamper with a witness offense.

¶22 To establish solicitation to tamper under § 45-7-206(1)(b), MCA, in this case, the jury would be informed that Smith was arrested for an offense, he had knowledge of an ongoing criminal investigation or proceeding, and the relation of the witness to the charge. This could likely have been accomplished through stipulation or other means, rather than through an in-depth discussion on domestic violence and its impact on victims and society. Although the District Court did caution the jury that Smith was not on trial for PFMA or stalking and instructed it not to use the references to those charges inappropriately, the extensiveness of the domestic violence discussion instigated by the State had the natural

9

tendency to prejudice the jury against Smith.[1]  We recognize the value of a curative instruction to try to limit the prejudice inherent from this type of discussion; but in light of the cumulative errors discussed below we cannot conclude the instruction was sufficient to cure the prejudicial impact of the allegations regarding Smith's underlying conduct.

*Opening Statement*

¶23    In its opening statement, the State again primed the jury to the dismissed offenses. It emphasized the violent nature of the dismissed PFMA charge—T.W. told law enforcement Smith assaulted her and would not leave her alone and law enforcement personally witnessed T.W.'s injury.  The State then emphasized law enforcement also verified the "numerous messages and calls" from Smith to T.W., which formed the basis for the dismissed stalking offense.  Smith objected to the State's presentation of these other bad acts, correctly advising the original underlying offenses did not need to be proven.

¶24    In *State v. Fleming*, 2019 MT 237, ¶ 36, 397 Mont. 345, 449 P.3d 1234, we acknowledged that the manner in which a jury is exposed to prior bad acts may exacerbate its prejudicial nature.  Similar to *Fleming*, the jury was exposed to the defendant's prior bad conduct nearly immediately.  The State did not move to dismiss the PFMA and stalking

---

[1] We held in *State v. Ellison* that the defendant's involvement with the person he was trying to frame for arson "explained the circumstances underlying the charged offenses [which included tampering with evidence] and allowed the complete picture to be given to the jury." *State v. Ellison*, 2018 MT 252, ¶ 15, 393 Mont. 90, 428 P.3d 826 (internal quotation omitted).  On the other hand, undue prejudice may not be injected into a proceeding if the prejudice can be avoided. *State v. Zimmerman*, 2018 MT 94, ¶ 38, 391 Mont. 210, 417 P.3d 289.  Here, the way in which the State presented the allegations of the precipitating offenses injected undue prejudice into the proceeding while eliminating other means to avoid the prejudice.

charges before its voir dire—despite previously advising the court it could not proceed with voir dire until its main witness arrived. Thus, exposing the jury to the very prejudicial nature of the PFMA and stalking charges and permitting the State to extensively delve into partner assault and domestic violence issues without objection. Permitting the State to imply in its opening in the manner it did that Smith committed violent offenses verified by law enforcement injected the additional potential for prejudice. This alone, may not rise to the level of reversible error, but could in conjunction with other errors lead to the conclusion Smith did not receive a fair trial.

*Trial*

¶25    In its case-in-chief, the State introduced extrinsic evidence of other bad acts related to Smith's cell phone through Officer Shanks and Detective Anderson. Officer Shanks testified T.W. came to the law enforcement center and disclosed Smith was stalking her by sending numerous text messages to her and she wanted him to stop. Officer Shanks reached Smith at the phone number T.W. provided him and set up a meeting with him. Officer Shanks testified that during their meeting Smith denied having a smartphone. Smith objected on the basis of hearsay—it was not a statement against his interest in this case. Smith also objected on the basis of relevancy—whether Smith admitted or denied having a smartphone had no relevance to whether he at a later time committed the solicitation to tamper offense. The court overruled the objection on the sole basis that the statement was made by Smith. It was error for the District Court to admit this testimony. Although the statements made by Smith to Shanks about not having a cell phone did not go to proving

11

an element of the offense charged, they were offered against Smith. In *State v. Smith*, 276 Mont. 434, 441, 916 P.2d 773, 777 (1996) we explained "[a]n 'admission by party-opponent' under Rule 801(d)(2)(A) is a statement which is 'the party's own statement' offered against the party." In this context, we agree with the District Court that Smith's statement is not hearsay under M. R. Evid. 801(d)(2)(A). Although not hearsay, the statements attributable to Smith by Shanks had no relevance to establishing that Smith later committed the solicitation to tamper offense.

¶26 Following Shanks, the State called Detective Anderson to testify. The State established Anderson worked for the police department in the violence against women position. Anderson testified he was asked to retrieve some messages from some phones. Smith objected based on relevance—the text messages related to the dismissed stalking offense and predated the alleged tampering offense. The State countered, "Your Honor, this goes to the veracity of the defendant. It's a credibility issue." Smith strongly disagreed, pointing out the evidence was relevant only to uncharged crimes. The parties then went to chambers where they had a discussion outside the presence of the jury. The State explained when Smith was booked into jail, he had a phone on his person and that a second phone was located at his residence. When those phones were downloaded, the phone "that had been hidden . . . and not been given to law enforcement, was the phone that had all the messaging." The State asserted Smith to be "lying and intentionally misleading the investigation even at this point, which goes to his credibility about whether

12

he would be testifying truthfully."[2]  The State asserted it expected Smith would later testify "which would make [Smith's] credibility an issue."  Smith again pointed out the text messages pre-dated the solicitation charge and thus were not relevant to prove the later tampering offense and also were inadmissible under M. R. Evid 404.  The court then inquired if Smith was going to testify, and defense counsel related he would, but "we could cross that bridge when we come there . . . we'll stipulate that he was charged with a misdemeanor, stalking.  There's no relevant [sic] to this evidence outside of making [Smith] – basically bringing – bringing up the stalking."  Based on Smith's intention to testify, the court overruled the objection and gave Smith a continuing objection to this line of questioning.[3]

¶27  After the State's case-in-chief, Smith did indeed testify.  Smith testified to the jail calls between himself and his sister and his mother and generally denied soliciting them in any way to get T.W. not to appear at trial.  Upon cross-examination, the State asked Smith about his meeting with Shanks, and Smith testified he had advised Shanks he had only a flip phone and did not have a smartphone.  Smith objected to going further into this line of questioning as it was outside the scope of direct.  The District Court responded, "It's impeachment.  Overruled."  Over the ensuing five pages of trial transcript, the State

---

[2] Smith was not charged with obstruction of justice for impeding the criminal investigation nor was he charged with a tampering offense related to lying and misleading the investigation.

[3] The District Court stated, "I don't think that's what the texts do.  They're talking about how the texts reflect his credibility.  And the jury will determine credibility of the witnesses.  But this goes towards evidence of credibility."

13

continued to ask Smith about the phones and texts implicating him in criminal stalking activity. The State then turned to questioning Smith about telephone calls between himself and his friend Whitney.[4] During this inquiry, Smith testified Whitney helped rent a place for him to live upon release. When the State questioned that it was located in the vicinity of T.W.'s residence, Smith objected on the basis of relevance—where Smith intended to live upon future release had no relevance to the elements of the tampering offense being tried. Again, the District Court asserted such went "towards impeachment" and noted "You made your relevance objection; the Court has overruled it." Through this questioning, the State was permitted to elicit evidence that Smith was on probation, did not care that the place was near T.W.'s, and did not care the residence's location violated a condition of release. The State then questioned Smith further about him having Whitney talk to his employer to provide something saying he had a job and whether he remembered telling Whitney it did not matter whether he actually had a job as long as the employer would say that he did. Smith expressed he did not remember that.

¶28 The State re-called Detective Anderson on rebuttal to discuss Smith's phone calls with Whitney. Again, Smith objected to relevance and asserted they were further improper under M. R. Evid. 404(b). The State asserted it was "seeking the testimony for impeachment purposes and to establish credibility issues." The District Court overruled

---

[4] Recordings of the calls between Smith and Whitney were not provided to Smith or his counsel prior to trial, reportedly as they had no relevance to the PFMA, stalking, or tampering offenses.

the objection and gave Smith a continuing, but overruled, objection to questions about Smith's phone calls with Whitney. Through Anderson's testimony the jury learned Smith asked Whitney to misrepresent that he had a job, he did not care about violating a court ordered condition of release, and he did not even seem to appreciate Whitney's help.

¶29 We are troubled by the apparent confusion of the State and the District Court as to how credibility of a witness is impeached. Generally, a trial witness is impeached or discredited through cross-examination.

> Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. . . . [T]he cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness. . . . A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.' We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.

*State v. Camitsch*, 192 Mont. 124, 133, 626 P.2d 1250, 1255 (1981) (quoting *Davis v. Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105, 1110 (1974) (quoting 3A John Henry Wigmore, *Evidence in Trials at Common Law* § 940, 775 (Chadbourn rev. 1970) and citing *Greene v. McElroy*, 360 U.S. 474, 496, 79 S. Ct. 1400, 1413 (1959)) (alterations in original); *see also State v. Weik*, 2018 MT 213, ¶ 14, 392 Mont. 415, 427 P.3d 52; *State v. Mizenko*, 2006 MT 11, ¶ 13, 330 Mont. 299, 127 P.3d 458; *State v. MacKinnon*, 1998 MT 78, ¶ 37, 288 Mont. 329, 957 P.2d 23; *State v. Short*, 217 Mont. 62, 67, 702 P.2d 979, 982 (1985).

However, the extent of cross-examination as to whether a witness has been accused of another or prior crime is restricted because of the limited probative value in relation to credibility. *Short*, 217 Mont. at 67, 702 P.2d at 982.

¶30 When Shanks and Anderson testified, Smith had not yet testified. As such, he had not, during trial, presented any inconsistent version to that of Shanks or Anderson with regard to their investigations of the dismissed PFMA or stalking charges. He also had not testified as to any telephonic interaction between himself and Whitney. To impeach Smith's trial credibility with the testimony of Shanks and Anderson regarding what Smith related to them about the additional phone, Smith would first have to testify at trial as to what he told Shanks and Anderson and if inconsistent with Shanks's or Anderson's recollections, the State could then cross-examine Smith as to whether he told a different version of events to Shanks or Anderson. If Smith persisted in asserting an inconsistent version in his trial testimony, the State could later call Shanks and Anderson as rebuttal witnesses to attack Smith's trial credibility. Merely because a defendant may intend to testify, does not open the door for the State to proactively impeach through other witnesses what it anticipates the defendant's trial testimony will be with evidence of prior instances where the defendant lied to or misled someone.

¶31 Trial was proceeding only on the tampering offense, which was alleged to have occurred well-after Smith's interactions with either Shanks or Anderson. In a prosecution for tampering, limited evidence may be introduced if it "is intrinsic to or inextricably intertwined with a charged crime for the purpose of providing a comprehensive and

16

complete picture of the commission of a crime." *Ellison*, ¶ 14 (internal quotations omitted). Here though, that was not the State's articulated purpose for offering the evidence, and it did not explain how the evidence was necessary to show context for or any element of the tampering offense. It argued instead that the evidence went to Smith's credibility. The evidence regarding the text messages and Smith's misinformation about not having a smart phone were clearly prejudicial as such portrayed Smith as a violent, stalking liar, but they were not relevant to prove any element of the tampering offense. Thus, unless admission of this evidence could be established to be admissible for another purpose—such as demonstrating Smith's character or a trait of character or providing legitimate context—such evidence would not be admissible. Again, if the initial hurdle of relevance of the evidence concerning the telephonic communications between Smith and Whitney is crossed[5], the State would have to follow a similar process to impeach Smith with this evidence. Smith would first need to testify inconsistently with the recorded conversation. The State would then cross-examine him, and if he persisted in his inconsistent version, he could be impeached with the recorded communication.

¶32 Evidence related to Shanks's and Anderson's investigations of the dismissed PFMA and stalking charges was extrinsic evidence not related to any element of the tampering offense being tried. It appears the District Court's basis for admitting the evidence

---

[5] The State asserted it did not provide Smith a recording of his jail conversations with Whitney as it determined they were not relevant to the offenses charged.

regarding the extrinsic investigation of dismissed charges was that it suggested Smith was characteristically untruthful such that the jury could infer that his upcoming[6] trial testimony would also be untruthful.  Evidence related to Smith's telephone calls with Whitney was likewise extrinsic evidence not related to any element of the tampering offense being tried.  The District Court's basis for admission of this evidence was that Smith intended to testify, and his credibility was thus at issue and could be attacked.  After Smith testified on direct and did not testify as to any of his telephone communications with Whitney, the State began questioning Smith regarding his conversations with Whitney.  Smith properly objected to the line of questioning as beyond the scope of direct, not relevant, and inadmissible under M. R. Evid. 404.  In error, the District Court concluded this to be proper impeachment and overruled the objection.  Merely because Smith testified at trial, he did not open the door to cross-examination exceeding the scope of direct as concluded by the District Court.  The State legitimately could cross-examine Smith to call his credibility into question, could offer rebuttal evidence for that purpose, or both.  But it was error for the District Court to permit proactive impeachment of Smith through other witnesses in the State's case-in-chief and to exceed the scope of direct to permit admission of otherwise extrinsic, irrelevant evidence.

---

[6] It is noted, although Smith indicated he was going to testify, he had the right to later elect not to do so.  Whether Smith exercised his right to not testify would not be known until after the State's case-in-chief.

¶33 Rule 404(a) generally provides, "[e]vidence of a person's character or a trait of character is not admissible for purpose of proving action in conformity therewith on a particular occasion." M. R. Evid. 404(a). Further, Rule 404(b) provides "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." M. R. Evid. 404(b). While evidence of a person's character is not ordinarily admissible to prove he acted in conformity with it, Rule 404 provides an exception under Article VI. M. R. Evid. 404(a)(3). Under Article VI, Rule 608 provides direction for admission of character and specific conduct evidence: "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's credibility, may not be proved by extrinsic evidence." In the discretion of the court though, specific instances of conduct may "be inquired into on cross-examination" only. M. R. Evid. 608(b). This exception is narrowly drawn in recognition of the opportunities for its abuse. *In re Seizure of $23,691.00 in United States Currency*, 273 Mont. 474, 480-81, 905 P.2d 148, 152-53 (1995). Thus, Rule 608 admits such evidence *only on cross-examination* and only if probative of a witness's truthfulness or untruthfulness. *In re Seizure of $23,691.00 in United States Currency*, 273 Mont. at 481, 905 P.2d at 153. In *State v. McClean,* 179 Mont. 178, 185, 587 P.2d 20, 24-25 (1978) (emphasis in original), this Court provided example of how to apply Rule 608:

> Thus, on direct examination Witness A may not bolster his opinion concerning the truthfulness or untruthfulness of Witness B by making reference to specific instances of B's conduct. On cross-examination, however, Witness A may be questioned on his opinion by reference to such specific instances. This cross-examination, however, is further

19

limited by the trial court's discretion in determining whether it is in fact relevant to the issue of B's credibility. The point of Rule 608 . . . is that reference to specific instances of a witness' conduct for the purpose of proving his character for truthfulness or untruthfulness is *never* permitted on direct examination.

The District Court did not properly apply Rules 404 and 608[7] and erred in admitting the extrinsic evidence of Smith's other bad acts.

¶34 At the outset, the State characterized the case as one of domestic violence and primed and exploited use of jurors' attitudes regarding partner assaults and domestic violence against Smith. Then, despite dismissal of the PFMA and stalking charges, throughout the entire evidentiary presentation the State used irrelevant, extrinsic evidence, revealing Smith as a probationer and portraying him as a stalking liar who had no regard for court orders or appreciation of his friends. While perhaps no single one of the errors discussed above would warrant reversal, cumulatively they were prejudicial to the extent Smith did not receive a fair trial.

## CONCLUSION

¶35 The numerous errors discussed above, when taken together, prejudiced Smith's right to a fair trial, mandating reversal of Smith's conviction under the doctrine of cumulative error.

---

[7] Despite Smith's objections to relevance under M. R. Evid. 404—which specifically references that character evidence is not admissible except as provided in Article VI (which encompasses Rule 608)—it appears the District Court did not fully appreciate the interplay between M. R. Evid. 404 and M. R. Evid. 608, mistakenly concluding Smith did not effectively raise Rule 608 issues by his objections.

¶36    Reversed and remanded for retrial.

/S/ INGRID GUSTAFSON

We concur:

/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ DIRK M. SANDEFUR


Justice Jim Rice, specially concurring.

¶37    I concur with the Court's determination to reverse Smith's conviction on the basis of cumulative error, but would employ a slightly different analysis.  Smith's trial began with the court providing a typical explanation for the jury of the charges to be tried, including reference to the PFMA and stalking charges.  Questions about those charges were asked during voir dire, but none of the jurors believed any of their past experiences would hinder their ability to judge the case fairly, and the charges were again referenced during the State's opening statement.  The State moved to dismiss the charges prior to the presentation of evidence, but they were nonetheless relevant to the remaining tampering charge because it was necessary for the State to demonstrate that Smith acted upon a belief "that an official proceeding or investigation is pending or about to be instituted."  Section 45-7-206(1), MCA.  The court provided an instruction that cautioned the jury that Smith was not on trial for PFMA or stalking, and not to use the references to those charges

21

inappropriately. Had this been the extent of the emphasis on the dismissed charges, I would not conclude there was reversible error.

¶38 Evidence of Smith's actions during the initial PFMA and stalking investigation that led to the filing of those charges, and ultimately to the filing of the related tampering charge, was also admitted. During questioning by police, Smith attempted to undermine the investigation by misleading officers with statements that he did not have a smart phone nor contacted T.W. The tampering charge arose from continuing behavior by Smith within the context of his relationship with same the individual and within a short span of time, and was a further attempt to undermine and avoid the same charges. The State was entitled, in my view, to a limited inquiry into these actions by Smith to establish that relevant context and demonstrate the continuing course of his conduct. As we have explained, "it is permissible to admit limited evidence that is 'intrinsic to' or 'inextricably intertwined with' a charged crime for the purpose of providing 'a comprehensive and complete picture of the commission of a crime.'" *State v. Ellison*, 2018 MT 252, ¶ 14, 393 Mont. 90, 428 P.3d 826 (internal quotations and citation omitted); § 26-1-103, MCA.

¶39 However, as stated, this inquiry is supposed to be "limited," and the District Court likewise cautioned prosecutors to keep the inquiry about Smith's actions "narrow." Despite that admonition, a significant amount of evidence was admitted about Smith's actions related to the dismissed charges and, in conjunction with the initial trial focus on the PFMA and stalking charges during the court's introductory explanation, voir dire and opening statements, I believe that, in totality, Smith was deprived of a fair trial because of

22

over-emphasis on the dismissed matters.  While I would not have found reversible error under these issues individually, I believe this is one of the rare cases where the impact of multiple issues upon the trial combine to require reversal under the concept of cumulative error.

/S/ JIM RICE